Argued January 18; affirmed February 8; rehearing denied
March 15, 1949

# In re UNION SCHOOL DISTRICT No. 5, SCOFIELD et al. v. STANLEY et al.

202 P. (2d) 509

*Joseph M. Devers, Jr.,* and *Robert W. DeArmond* argued the cause for appellants. On the brief were Devers & DeArmond, of Salem.

*George Rhoten* argued the cause for respondents. On the brief were Rhoten & Rhoten and Sam F. Speerstra, of Salem.

Before LUSK, Chief Justice, and BRAND, BELT, ROSSMAN, BAILEY, and HAY, Justices.

BAILEY, J.

This proceeding was brought in the Circuit Court of the State of Oregon for Marion County by the directors of Union High School District No. 5, Marion

County, Oregon, pursuant to §§ 111-3159 and 111-3160, O. C. L. A., "for the purpose of having a judicial examination and judgment of the court as to the regularity and legality of the proceedings in connection with the organization of the district and the election and organization of the union high school board of such district." Section 111-3160 provides that any person interested in the organization of the union high school district may, at any time before the expiration of the period specified in such section, "appear and contest the validity of such proceeding, or of any of the acts or things therein enumerated". In compliance therewith Anna E. Stanley, W. V. Chamberlain, Leonard E. Doerfler, J. E. Lewis and J. J. Kendell, hereinafter referred to as the objectors, appeared in this proceeding and objected on several grounds to the court validating the proceedings in connection with the organization of the district. From a judgment and decree of the Circuit Court declaring and adjudging "all of the proceedings by which said union high school district was organized * * * to have been regularly and legally conducted and done and all of such proceedings * * * confirmed, validated and legalized" and the individuals bringing this proceeding to be the "duly elected, qualified and acting members of the school board" of such union high school district, the objectors have appealed.

Only one assignment of error is set forth in the objectors' brief, which assignment is based on the alleged error of the court in entering a decree in favor of the directors of the school district. Under this assignment four propositions are argued, to wit:

(1) The geographical boundaries of the proposed union high school district on the 10th day

of December, 1947, when the question of the formation of the district was voted on, were not the same as those described in the petitions filed with the district boundary board for the organization of the district;

(2) ''At the time the question of the formation of Union High School District No. 5 was submitted to the voters, no site was legally available for the construction of a school building'';

(3) ''The election board of District No. 126 through its members refused to permit a legally qualified voter to cast his ballot at the election of December 10, 1947''; and

(4) In the election held on December 10, 1947, for the formation of a union high school district ''27 ballots were cast by voters whose names did not appear upon the assessment roll for the year of 1947 or whose names appeared on the assessment roll as to one district and said voters voted in another district and for this reason 27 votes were illegally received or cast in the geographical district vote in the alleged creation and formation of Union High School District No. 5.''

Section 111-3143, O. C. L. A., as amended by chapter 253, Oregon Laws 1945, governs the procedure to be followed in the formation of union high school districts.

The union high school district here involved has a valuation of $2,491,333 and includes the following seven school districts: Aumsville, No. 11C; Marion, No. 20; West Stayton, No. 61; Turner, No. 79; Crawford, No. 124; North Santiam, No. 126; and Cloverdale, No. 144C. At the time of its organization two of such elementary school districts, to wit, Aumsville, No. 11C, and Turner, No. 79, maintained standard high schools. The district school board in each of these districts, pursuant to subdivision 1, § 111-3143,

as amended, adopted a resolution declaring in favor of uniting with the other elementary school districts, above named, for the purpose of forming a union high school district. Neither the Aumsville district nor the Turner district purposed "to furnish the site for the proposed union high school". Thereafter each of said school boards called a special election to be held on October 1, 1947, "to vote", as stated in the notice of election, "upon the formation of a Union High School district with Turner District No. 79 [or Aumsville District No. 11C, as the case might be]; site to be located in the William Porter Donation Land Claim, in T. 9 South R 1 West; and in Section 1, in T. 9 South, R 2 West of the Willamette Meridian, in Marion County, State of Oregon, with the desire of including districts Nos. 20, 61, 124, 126, 144." In each district, Turner and Aumsville, the vote was in favor of the formation of a union high school district and of the site described in the notice of election as the location of the union high school.

On October 2, 1947, the other five school districts filed petitions with the secretary of the district boundary board requesting the district boundary board "to fix a date for a hearing on the question for forming a Union High School in accordance with Chapter 31, Article III, Section 111-3143, Oregon School Laws, 1946, for the following school districts, located in Marion County, Oregon to-wit:" The names and numbers of the seven school districts hereinbefore mentioned are here inserted. A description by metes and bounds of the site of the proposed union high school was set forth in the petitions. Each petition was signed by the requisite number of qualified voters.

The Marion County District Boundary Board met

on October 13, 1947, considered the aforementioned petitions for the formation of a union high school district and set November 13th as the date of hearing. Notice of this hearing was duly given. Prior to the date set for the hearing remonstrances against the formation of the proposed union high school district were filed by four of said five school districts. On the 13th day of November, 1947, the district boundary board met "to give a hearing on the proposed union high school district to be in the Turner-Aumsville area" and "set December 10, 1947, between the hours of 8 and 9 o'clock P. M. in each of the concerned districts, for an election to vote on the question of the proposed union high school". Pursuant to the direction of the district boundary board elections were held on December 10, 1947, in the five districts. The minutes of the meeting of the district boundary board held December 19, 1947, read in part as follows:

"The result of the vote on the proposed union high school district shows as follows:

| "District No. | Yes | No | Chal-lenge | Total |
|---|---|---|---|---|
| 20—Marion | 27 | 40 | 0 | 67 |
| 61—West Stayton | 35 | 12 | 0 | 47 |
| 124—Crawford | 8 | 0 | 0 | 8 |
| 126—North Santiam | 22 | 21 | 0 | 43 |
| 144C—Cloverdale | 13 | 28 | 1 | 42 |
| Totals | 105 | 101 | 1 | 207 |

"Since the official canvass of votes shows that a majority of the total votes cast and the majority of districts concerned were in favor of the formation of said union high school district, a union high school district including the above-named districts has been established as of this date. It will be known as Union High School District No. 5."

We shall now consider the propositions discussed by the objectors under and in connection with their assignment of error, and in doing so we shall not overlook the clause in § 111-3160, *supra,* pursuant to which section the proceeding was brought, providing that "The court, in inquiring into the regularity, legality or correctness of any of said proceedings, must disregard any error, irregularity or omission which does not affect the substantial rights of the parties to said special proceedings, and may approve the proceedings in whole or in part and disapprove and declare illegal or invalid other or subsequent proceedings in whole or in part, and the court may approve the proceedings in part and disapprove the remainder thereof."

After the petitions of the five school districts had been filed and on or about the 13th day of October, 1947, a petition was filed with the district boundary board requesting that a tract of land consisting of approximately 113 acres, owned by R. N. Harner, be transferred from North Santiam District, No. 126, to Stayton District, No. 77. The assessed value of the property in the union high school district is $2,491,333 and in North Santiam District, No. 126, is $143,694. The estimated value of the Harner property is approximately $2,000. The district boundary board fixed October 31, 1947, as the time for hearing this petition and due notice thereof was given. On the 31st of October, 1947, the district boundary board met and granted the change of boundaries of the two districts concerned in accordance with such petition, the reason for its action being stated as follows: "The change of boundary was granted because this Board felt it was for the best interests of the children concerned since, under the new Rural School District Board

equalization levy, it would not affect the budget making or levy of the North Santiam District. The Harners and others of this section will continue to pay their share of the bonded indebtedness of North Santiam District."

Mrs. Agnes Booth, School Superintendent of Marion County and ex officio Clerk of the District Boundary Board, testified that there are two families living on the Harner property. One of the families has no children and the other has two children, one of whom is of school age.

It is argued by the objectors that inasmuch as the Harner property was included in North Santiam, No. 126, school district at the time the petitions for the formation of a union high school district were filed, but had been eliminated therefrom prior to December 10, 1947, when the election was held, the entire proceedings for the formation of the district were void. We quote from their brief, as follows:

" * * * It is our position, although we have been unable to find any authority either for or against, that the petition then before the District Boundary Board could not be acted upon by that board after transferring the property because. the proposed district pursuant to the elections were different both in valuation and acreage and geographical outline than that which could be acted upon by the Boundary Board after the transfer of the R. N. Harner property. Such a diminution in acreage and valuation will invalidate the formation of the district."

We too have been unable to find any adjudication on the question thus presented. *Will v. District Boundary Board*, 141 Or. 54, 16 P. (2d) 24, cited by the objectors, is of little, if any, assistance. The facts in that

case disclose that while the petitions of a group of school districts, referred to as the Amity group, for the formation of a union high school district were pending before the district boundary board, petitions of another group, known as the Dayton group, were filed with the district boundary board for the same purpose. Both groups included districts No. 20 and No. 94. The district boundary board first acted upon the petition of the Dayton group. It was contended by plaintiffs "that because the district boundary board first acted upon the Dayton group of petitions it had exhausted its authority as to any conflicting petitions in the Amity group." The court rejected this contention. It pointed out that Oregon did not have a statute similar to the one involved in the cases from Arkansas, on which the plaintiffs relied. It then said that, until the legislature sees fit to fix the procedure to be followed where more than one group of petitions had been filed, it would appear that the safe rule to adopt is "to follow the sound and well established maxim, 'First in time, superior in right.' When a petition or petitions complying with the requirements of the statutes are filed with the district boundary board, the board should not entertain any conflicting petitions until the first filed is finally disposed of either by being dismissed by the board for a legal reason or by an adverse vote at an election called and held according to law." The procedure suggested by the court had not been followed in that case but the court, nevertheless, upheld the procedure which was followed.

■ The petition to transfer the Harner property from North Santiam District, No. 126, which was within the proposed union high school district, to Stayton District, No. 77, which was without the district, was

not in conflict with the petitions requesting the formation of the union high school district. Its transfer was pursuant to § 111-803, O. C. L. A. The school districts which were proposed to be united for the formation of a union high school district were described in the petitions, notices of election and ballots by names and numbers and not by metes and bounds. When the electors voted on the question of the formation of the union high school district they knew what school districts were involved but they probably did not know the territorial boundaries of any of the districts. We fail to see how the transfer of the Harner property to a district not within the proposed union high school district could affect the "substantial rights" of the objectors. In our opinion this transfer of the Harner property did not in any way affect the legality of the proceedings for the formation of the union high school district here under attack.

■ It is next argued by the objectors that there was no site "legally available for the construction of a school building" at the time of the December 10th election. We have been unable to find in the statute any requirement that a site shall be "legally available" for the construction of a school building at the time the petitions are filed, at the time of the election, or at any other time during the formation of a union high school district. Subdivision 1 of § 111-3143, as amended (Ch. 253, Oregon Laws 1945), provides that "if a site is proposed to be offered" by a district maintaining a standard high school the notice of election, at which the question of uniting with certain other school districts is submitted to the legal voters of such high school district, shall contain a statement of the "extent, terms and conditions of such offer."

No site was offered by either of the high school districts maintaining high schools. Subdivision 2 of § 111-3143, as amended, provides that petitions directed to the district boundary board shall specify "the districts or parts of districts proposed to be united, and the site for the location of the union high school". Subdivision 6 of the same section provides that the "notices of election shall clearly state that the question of forming a union high school district for high school purposes only, specifying the districts to be united, and the site, will be voted upon at such election". Subdivision 9 of the same section provides that if two or more contiguous school districts, in which no standard high school district is included, desire to unite for high school purposes only "the petition for organization and the notices for election, if one is called, shall specify with reasonable exactness the site where the buildings of the proposed union high school shall be located * * * ."

All the petitions and notices of election specified the districts to be united and the site for the union high school. The site specified is referred to as the "Darley site". On September 17, 1947, C. H. Darley and his wife gave to Aumsville School District No. 11C and Turner School District, No. 79, a sixty-day option to purchase this property for $11,250. This option expired on the 17th day of November, 1947, and before the election was held. On March 20, 1948, Darley and wife gave to Union High School District No. 5 an option until November 1 of that year to purchase the property at $250 an acre. There is undisputed evidence that, during the period between the expiration of the first option and the granting of the second option, the Darleys were willing to sell the property to the union high school district.

The statute does not require that the proposed site for the new union high school district shall have been purchased or that an option to purchase the same be procured. Even if the owner of the site had been unwilling to sell, there is nothing which would have prevented the union high school district from acquiring it by eminent domain. There is no merit in the objectors' contention that the proceedings are void or voidable because the written option had expired before the December 10th election.

The third proposition discussed by the objectors is that the "election board of District No. 126 through its members refused to permit a legally qualified voter to cast his ballot at the election of December 10, 1947". Section 111-3142 provides that a legal voter, i.e., one qualified to vote at the formation of a union high school district,

"means any citizen of this state, male or female, who is 21 years of age and has resided in the district 30 days immediately preceding the meeting or election and has property in the district, as shown by the last county assessment, and not assessed by the sheriff, on which he or she is liable or subject to pay a tax. The property qualifications imposed by this section shall not apply in the election of school directors; provided, that any person shall be deemed to have complied with the property qualification imposed by this section who presents to the directors or judges of election satisfactory evidence that he or she has stock, shares, or ownership in any corporation, firm or copartnership which has property in the district, as shown by the last county assessment, and not assessed by the sheriff, on which such corporation, firm or copartnership pays a tax, even though his or her individual name does not appear upon the tax roll. The chairman of any school meeting, or any quali-

fied elector, hereby is authorized to challenge any person who may offer to vote at such meeting. * * *''

Subdivision 7 of § 111-3143, *supra,* as amended, provides that in case any voter is challenged his or her right to vote shall be determined as provided in § 111-910. Section 111-910 provides as follows:

" * * * In case an elector has been challenged or disqualified, it shall be the duty of the chairman of such meeting to administer to each person so challenged an oath that he or she will answer truly all questions propounded to him touching his place of residence and qualifications as elector at such meeting, and, upon taking which, he shall interrogate him respecting his citizenship in this state, his age, residence in the district immediately preceding the meeting or election, and whether he has property or shares in a corporation in the district, as shown by the last county assessment, and not assessed by the sheriff, on which he or she is liable or subject to pay a tax; and if the meeting be for the election of school directors or clerks, he shall interrogate him as to whether he is a resident and otherwise qualified as an elector.''

W. V. Chamberlain, the individual referred to by the objectors, resided in North Santiam School District, No. 126, and was purchasing a farm on contract. He testified that on the evening of December 10th he and his wife went to the Santiam School house where the election was held and that Mr. Crane, who was clerk on the election board,

"asked me if I thought I could vote, or maybe not in those words, but it meant the same thing more or less, and I said, 'I don't know; I have been voting.' I voted in previous elections which had to do with this Stayton Union High School and had signed a remonstrance, I believe, also had signed a

petition, at least one. 'Well,' he says, 'Your name isn't on this list I have, and are you supposed to be on the tax roll?' And I said, 'I am buying on contract, probably not.' And I said, 'You let me vote before.' 'Well,' he says, 'You can't vote tonight. And I says, 'That is kind of funny when I voted before and can't tonight'. And he says, 'You can vote for the directors'. And I said, 'If I can't vote for the high school, there is not much use of voting for the directors'. And finally he said, 'You go vote; we can't stop you from voting but we will have to throw the ballot out'. And I said, 'If you are going to throw it out there isn't much use of my voting'. Well, then, the Missus and I turned around and left the school house.''

Ray Tomlinson was chairman of the election board. Mr. Chamberlain testified that he knew Tomlinson but did not recall seeing him that evening. He stated that Mrs. Hammer was present and he thought she ''made some remark in backing up Mr. Crane's statement.'' He further testified:

''Q. Isn't it a fact that no personal property did appear in your name on the assessment roll within that district? A. Very correct.

''Q. And you were paying no taxes in this county under your own name? A. That is right. As far as that is concerned, it is right.

''Q. You didn't at that time offer any document to the judge of the school board or the judge of the school election—you didn't offer any paper or document at that time? The only document you had was the ballot you had in your hand? Is that true? A. That is right.

''Q. You didn't offer any other document or paper to the judge of the election board at that time? A. No, sir; I wasn't asked to.

\* \* \*

"Q. Were you ever asked if you were the owner of shares of stock in a corporation owning property in that district, by Mr. Crane or the chairman of the election board, at that time? A. No, sir.''

Chamberlain's testimony differs somewhat from that of Mrs. Hammer and Mr. Crane. Mrs. Hammer, who was clerk of School District No. 126, gave the following testimony:

"A. I heard Mr. Crane say, to the effect, 'Well, Vern, have you got your place straightened out in your name yet?' And Mr. Chamberlain said, 'No, sir, it was still on contract.' Something to the effect that he paid the taxes, but through another party, and then there was some question of personal property taxes, and since the law states that you must have property in the district as shown by the county assessment roll—

\* \* \*

"Q. Is that all of the conversation that you heard? A. Mr. Chamberlain said, 'If that is the way it is, I don't want to vote.

\* \* \*

"Q. Did you or did you not hear Mr. Merrill Crane state to Mr. W. V. Chamberlain substantially the following: 'If you vote we will have to throw your ballot out, so there is no use in your voting'? A. No, definitely not.

"Q. You didn't hear that? A. No, definitely. I didn't hear the first part; I wasn't listening at the start, but I did listen to the bulk of the conversation, with the exception of the first part.

"Q. Did you tell him he couldn't vote? A. I don't recall that. I think I said, 'It was tough you couldn't vote.'

"Q. But you didn't tell him he couldn't vote? A. No, he wasn't refused the right to vote.''

Mr. Crane gave the following testimony:

"Q. * * * Did Mr. Chamberlain present himself before your election board at the proper time and place of this election to cast his ballot? A. Yes.

"Q. What conversation took place between you and Mr. Chamberlain as the result of his asking to cast his ballot? A. I looked on the list and seen his name wasn't on it and I asked Mr. Chamberlain or told him that according to our instructions no one was allowed to vote if his name wasn't on the assessment roll and asked him if his name should appear there and he said, 'I guess not.' He never got around to getting the property in his name and it was, must be shown by his own name, and I wouldn't say his exact words of the conversation but we are in the habit of talking a lot and I asked him if he was assessed on personal property and he said, 'No, he wasn't,' and, he said, 'That was okay', if he didn't have a vote coming.

. * * *

"Q. Was there any conversation relative to Mr. Chamberlain casting a ballot or the result if he had balloted? A. No, there was no talk on that, as I remember."

In our opinion Chamberlain's right to vote on the question of the formation of the union high school district was not challenged. It is difficult to see how a voter could be challenged without bringing such matter to the attention of the chairman of the school meeting. It is the duty of such chairman, in case an elector has been challenged or disqualified "to administer to each person so challenged an oath that he or she will answer truly all questions propounded to him * * *." It is not contended that the alleged challenge was ever called to the attention of the chairman of the meeting, or that he had knowledge of it. What

actually occurred was a discussion between Crane and Chamberlain as to whether the property on which Chamberlain was living had been assessed in his name. Chamberlain admitted that it had not been. He also testified that he did not pay any taxes on personal property. He did not claim that he owned any stock in any corporation which paid taxes in that school district. Nor did he contend, at the time of the election, that he was qualified to vote. Moreover, Crane was not the one to decide that question.

■ Subdivision 8 of § 111-3143, supra, as amended, provides that if the district boundary board "shall determine that a majority of all votes cast, and a majority of all districts voting at such election, shall be in favor of forming a union high school district for high school purposes only, then said district boundary board shall declare such union high school district regularly organized". According to the minutes of the December 19th, 1947, meeting of the district boundary board, 105 votes were cast in favor of and 101 against the formation of the district and three districts voted in favor of and two against the formation. In North Santiam District, No. 126, 22 votes were cast in favor of and 21 against the formation. That is the district in which Chamberlain resided. Had he been qualified to vote and had he voted against the formation of the district, the vote in the North Santiam District would have been tied and the vote in a majority of the districts would not have been favorable to the formation of a union high school district.

■ The fourth proposition urged by the objectors is that the last county assessment roll did not show that 27 individuals who voted owned property in the districts in which they voted on which they were liable or

subject to pay a tax. Sections 111-910 and 111-3143 provide "that any person shall be deemed to have complied with the property qualification imposed by this section who presents to the directors or judges of election satisfactory evidence that he or she has stock, shares or ownership in any corporation, firm or copartnership which has property in the district, as shown by the last county assessment, * * * on which such corporation, firm or copartnership pays a tax * * *." We must presume, in the absence of evidence to the contrary, and there was none, that the election officials performed their duty and that no one not qualified was permitted to vote.

We find no error in the judgment and decree appealed from and the same is affirmed. Neither party will recover costs or disbursements in this court.